UNITED STATES DISTRICT COURT
SOUTHERIN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------
CHARBERN MANAGEMENT GROUP LLC,

                  *Plaintiff*,

           v.

BORAH, GOLDSTEIN, ALTSCHULER, NAHINS & GOIDEL,
P.C.,

                  *Defendant*,

--------------------------------------------------------------------------------

**Index No.:**

**COMPLAINT**

**JURY TRIAL
DEMANDED**

Plaintiff, by and through its attorneys, upon information and belief, allege as follows:

## INTRODUCTION

1.      This is a straightforward case of legal malpractice.  Plaintiff Charbern Management Group LLC ("Plaintiff" or "Charbern") retained defendant law firm Borah, Goldstein, Altschuler, Nahins & Goidel, P.C. ("Defendant" or "Borah") to serve as legal counsel in connection with the sale of Plaintiff's property.  After Charbern received three firm offers for the property, Charbern asked Borah to review the two draft purchase contracts with the highest offers.

2.      In the draft contract with the highest net purchase price, the potential purchaser had inserted a provision requiring Charbern to provide original written and notarized sales records and sales agreement for certain units in the property.  These records were necessary for the rent deregulation of those units.

3.      Borah either did not realize that this provision had been included in the contract or did not realize the provision's significance.  Borah and Charbern had previously discussed that Charbern did not possess such records.  Even if they had not had such discussions, Borah should

have confirmed that Charbern had the records required by the provision. Instead, Borah informed Charbern that the contract did not pose a problem for a sale. Accordingly, Charbern signed the contract, since it had the highest net purchase price.

4.      As detailed below, this provision of the executed contract – which Charbern could not fulfill – ultimately forced Charbern to decrease the sale price by more than one million dollars.

5.      Borah's malpractice is clear, as are the damages suffered by Charbern as a result of the malpractice.

## THE PARTIES

6.      Plaintiff Charbern is a limited liability company and has two members: the SCR Family Trust and the Bernice Roth Irrevocable Trust. The sole trustee of both trusts is Roger Roth ("Roth").

7.      Charbern was a New York limited liability company until April 2021, when it became a Wyoming limited liability company through statutory merger.

8.      Roth was a resident and citizen of New York until late May 2021, when he moved and became a resident and citizen of Florida.

9.      Defendant is a professional corporation incorporated in New York, with its principal place of business in New York.

## JURISDICTION AND VENUE

10.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1332 because Plaintiff and Defendant are each citizens of different States, namely Florida (Plaintiff) and New York (Defendant), and the overall amount in controversy exceeds $75,000 exclusive of interest and costs.

11.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendant is a resident of this District and a substantial part of the acts or omissions giving rise to this action occurred here in this District.

## FACTS

New York's Loft Law

12.     The Loft Law, Multiple Dwelling Law article 7-C, was enacted in 1982 to address the "serious public emergency . . . created by the increasing number of conversions of commercial and manufacturing loft buildings to residential use without compliance with applicable building codes and laws."  Multiple Dwelling Law ("MDL") § 280.

13.     The New York legislature found that "illegal and unregulated residential conversions" require "intervention of the state and local governments" to "establish a system whereby residential rentals can be reasonably adjusted so that residential tenants can assist in paying the cost of such legalization without being forced to relocate."  *Id.*

14.     The Loft Law provisions created a pathway to legalization for former commercial and manufacturing loft buildings used as residences despite a lack of residential occupancy certificates pursuant to a process overseen by the Loft Board.  *See* MDL § 282.

15.     To be eligible for Loft Law occupancy, the building must be an interim multiple dwelling ("IMD"): a building or structure "at any time occupied for manufacturing, commercial, or warehouse purposes" which "lacks a certificate of compliance or occupancy" and is occupied as a residence by "three or more families living independently of one another."  MDL § 281(1).

16.     The building must also be "in a geographical area in which the local zoning resolution permits residential use as of right," "within an area designated . . . as a study area for possible rezoning to permit residential use," or subject to a special permit for residential use

3

granted by a local planning agency, and "not owned by a municipality." *Id.* § 281(2).

17.     Section 284 of the Loft Law sets out necessary steps for legalization, requiring that owners "take all reasonable and necessary action to obtain a certificate of occupancy as a class A multiple dwelling."

18.     Once owners have come into compliance with safety and fire protection standards, they "may apply to the loft board for an adjustment of rent based upon the cost of such compliance," at which point "the loft board shall set the initial legal regulated rent, and each residential occupant qualified for protection . . . shall be offered a residential lease." *Id.* § 286(3).

19.     Under section 286(6), "a residential tenant . . . may sell any improvements to the unit made or purchased by [the tenant] to an incoming tenant provided, however, that the tenant shall first offer the improvements to the owner for an amount equal to their fair market value."

20.     If the owner purchases the improvements, "any unit subject to rent regulation solely by reason of this article . . . shall be exempted from the provisions of this article requiring rent regulation if such building had fewer than six residential units as of [June 21, 1982] or rented at market value subject to subsequent rent regulation if such building had six or more residential units at such time." MDL § 286(6).

21.     A separate provision, often exercised in tandem with a purchase of improvements, provides that "an owner and a residential occupant may agree to the purchase by the owner of such person's rights in a unit." MDL § 286(12).

22.     Upon purchase of the rights, the owner may return the unit to commercial use, relieving the owner of all Loft Law obligations, or continue residential use, subject to all Loft Law legalization requirements with the exception that "the unit is no longer subject to rent

regulation where coverage under [the Loft Law] was the sole basis for such rent regulation."  29 RCNY 2-10.

23.     Thus, subsections 286(6) and 286(12) allow an owner to deregulate units in an IMD.

Charbern and the Sale of Its IMD Property

24.     In or about March 2019, Charbern put a "for sale" sign on a building it owned that was located at 302 Canal Street, New York, New York (the "Property").

25.     In or about March 2019, Charbern received several offers to purchase the Property and Charbern engaged in serious negotiations with one potential purchaser.

26.     In or about May 2019, Charbern retained Borah to serve as legal counsel in connection with any sale or potential sale of the Property.

27.     Borah describes itself as "a full-service real estate law firm with the knowledge and experience to provide tailored advice regarding all aspects of real estate management and litigation."

28.     According to Borah, its "Loft Law practice group at Borah Goldstein is chaired by David R. Brody, who has forty years of experience representing Owners of loft buildings." Furthermore, Borah states that "[t]his practice group offers a wide array of services to owners of buildings that are or could be affected by the Loft Law."

29.     In or about May 2019, Charbern met with several law firm partners at Borah, including David Brody, to discuss the history of rent stabilization for some of the Property's units.

30.     At that meeting, they discussed the regulatory status of units in the Property under the MDL, since the Property was an IMD.

31.     They also discussed Charbern's lack of records that would confirm, support, and establish the deregulation of several of the Property's units under the Loft Law.

32.     Borah confirmed that the lack of such records would decrease the value of the Property and the price in any potential sale of the Property.

33.     In or about September 2019, Charbern negotiated a potential sale of the Property with three separate parties: Benchmark Real Estate Group, L.P. ("Benchmark"), Gideon Asset Management ("Gideon"), and SSM Realty Management ("SSM").

34.     Charbern gave each of these parties a draft sales contract for them to include the proposed purchase price and proposed revisions, if any.

35.     Gideon returned the proposed contract with a sales price of $5,000,000 and no revisions.

36.     Benchmark returned the proposed contract with a sales price of $5,350,000 – later increased to $5,400,000 – and several proposed revisions (the "Benchmark Contract"). However, the proposed sales price included a $100,000 payment to the sales broker; thus, the net amount received by Charbern in a sale would be $5,300,000.

37.     SSM returned the proposed contract with a different entity – BMSK LLC ("BMSK") – as the purchaser, a sales price of $5,350,000 with no broker's fee, and several proposed revisions (the "BMSK Contract").

38.     Charbern gave the Benchmark Contract and the BMSK Contract to Borah for its review, including whether anything in the proposed contracts would cause problems for Charbern in the sale process.

39.     Borah informed Charbern that neither of the two contracts posed a problem for a sale.

40.     Accordingly, because the BMSK Contract contained the higher net sale price, Charbern chose to enter into that contract.

41.     Charbern and BMSK executed the BMSK Contract on September 27, 2019.

42.      The BMSK Contract set March 27, 2022 as the closing date for the sale, with time being of the essence.

43.     However, unbeknownst to Charbern, one of the revisions included by BMSK in the BMSK Contract was Section 10.17.

44.     Section 10.17 of the BMSK Contract required Charbern to provide original written and notarized sales records and sales agreement for all prior occupancies of the Property's 3rd, 4th and 5th floor units that were in compliance with MDL § 286(6) and (12).

45.     Borah and Charbern had previously discussed that Charbern did not possess such records relating to MDL § 286(6) and (12).

46.     But Borah either did not realize that this provision had been included in the contract or did not realize the provision's significance.

47.     In a letter dated March 27, 2020, BMSK's counsel responded to a request from Borah to proceed with the closing.

48.     The letter stated that scheduling a closing date was inappropriate because of Covid-related deadline extensions by New York's governor and because Charbern had not yet fulfilled various requirements of the sales contract, including Section 10.17.

49.     BMSK's counsel sent another letter to Borah on this topic, dated March 30, 2020.

50.     On March 31, 2020, BMSK's counsel had a phone call to discuss the outstanding requirements of the BMSK Contract, including Section 10.17.

51.     On April 17, 2020, after not hearing back from Borah regarding fulfilling the

outstanding requirements, BMSK's counsel followed up with another letter to Borah.

52.     In a letter dated May 4, 2020, BMSK's counsel thanked Borah for addressing some issues and inquired again about fulfillment of the other remaining requirements, including Section 10.17.

53.     In a letter dated May 12, 2020, BMSK's counsel again inquired from Borah about fulfillment of Section 10.17.

54.     While all of these communications were taking place, Charbern remained unaware that there was any impediment on its side from proceeding with the transaction or from holding BMSK in default of the contract.

55.     During this time, Charbern told Borah to enforce the "time is of the essence" clause for the closing, but was told by Borah that the delay in the closing was due to Covid.

56.     Only on May 26, 2020, did Charbern learn – from an individual affiliated with BMSK – that the delay in closing the sale was caused by Charbern's inability to fulfill Section 10.17 of the BMSK Contract.

57.     On or about June 2020, because of Borah's error in connection with the BMSK Contract and Borah's subsequent concealment thereof, Charbern retained new counsel to assist with closing the sale of the Property.

58.     Charbern's new counsel arranged for an amendment to the BMSK Contract (the ("BMSK Amendment"), which was executed by Charbern and BMSK in September 2020.

59.     The BMSK Amendment: (i) decreased the sale price from $5,350,000 to $4,300,000; and (ii) waived any obligation of Charbern to deliver further documents pursuant to Section 10.17 of the BMSK Contract.

60.     The closing for the sale of the Property from Charbern to BMSK, pursuant to the

BMSK Contract and BMSK Amendment, took place on November 9, 2020.

## FIRST CAUSE OF ACTION
(Malpractice)

61.     Plaintiff repeats and realleges each of the prior allegations as if fully set forth herein.

62.     Charbern retained Borah to serve as his attorneys in connection with the negotiation and sale of the Property.

63.     In its representation of Charbern, Borah failed to exercise the care, skill, and diligence commonly possessed and exercised by a member of the legal profession.

64.     Borah failed to advise Charbern that the BMSK Contract contained a provision that Charbern would be unable to fulfill.

65.     On the contrary, Borah advised Charbern that the BMSK Contract contained no impediment to a sale of the Property.

66.     Borah should have advised Charbern that Charbern would have difficulty fulfilling Section 10.17 of the BMSK Contract.

67.     It was reasonably foreseeable that the failure of Borah to provide such advice – indeed, Borah's provision of contrary advice – would result in Charbern's inability to close the sale at the price set forth in the BMSK Contract.

68.     This failure by Borah was negligent.

69.     The negligence of Borah was a proximate cause of Charbern's inability to close on the sale of the Property at a sale price of $5,350,000.

70.      The negligence of Borah was also a proximate cause of Charbern's failure to sell the Property at the sale price offered by Benchmark or Gideon, as those proposed contracts contained no provision comparable to Section 10.17 of the BMSK Contract and there was no

other impediment to entering into, and closing pursuant to, those proposed contracts.

71.     The negligence of Borah was a proximate cause of Charbern's incurrence of approximately $60,000 in legal fees to engage new legal counsel to arrange for the BMSK Amendment and the closing of the sale of the Property.

72.     The negligence of Borah was a proximate cause of Charbern's carrying costs of approximately $17,000 per month in connection with owning the Property for eight months beyond the original closing date.

73.     But for the negligence of Borah, Charbern would not have sustained any damages.

**WHEREFORE**, Plaintiff hereby prays for judgment against Defendant for:

(i)     Damages in an amount to be proven at trial, but no less than $1,246,000;

(ii)     Interest and costs of this action; and

(iii)     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff respectfully requests a trial by jury of all issues so triable.

Dated: September 23, 2022
New York, New York

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC

By:     /s/ Yitzchak Eliezer Soloveichik
Yitzchak Eliezer Soloveichik
60 East 42nd Street, Suite 4600
New York, New York 10165
(212) 697-6484
soloveichik@bgandg.com
*Attorneys for Plaintiff*