UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHARBERN MANAGEMENT GROUP LLC, <br><br> Plaintiff, <br><br> v. <br><br> BORAH, GOLDSTEIN, ALTSCHULER, NAHINS & GOIDEL, P.C., <br><br> Defendant. | 22 Civ. 8137 (DEH) <br><br> **OPINION** <br> **AND ORDER** |

DALE E. HO, United States District Judge:

Plaintiff Charbern Management Group LLC ("Charbern" or "Plaintiff") sues Borah, Goldstein Altschuler, Nahins & Goidel, P.C. ("Borah" or "Defendant") for legal malpractice arising from Borah's alleged failure to advise Charbern that Charbern could not meet contract obligations in connection with its efforts to sell its property. First Am. Compl. ("FAC"), ECF No. 16. Borah countersued, alleging breach of contract. ECF No. 17. Before the Court is Borah's motion for summary judgment on (1) Charbern's malpractice claim and (2) Borah's breach of contract claim. ECF No. 42. For the reasons stated herein, Borah's motion for summary judgment is **DENIED**.

**BACKGROUND**[1]

### I.     The New York Loft Law

In 1982, the New York State Legislature passed Article 7-C of the Multiple Dwelling Law ("MDL"), also known as the Loft Law, to create a pathway for the legalization of former

---

[1] The following facts are drawn from the parties' submissions in support of and in opposition to the motion for summary judgment, including Borah's Local Rule 56.1 Statement of Material Facts ("Def.'s SOF"), ECF No. 43, and Charbern's Response to Borah's Local Rule 56.1 Statement ("Pl.'s SOF"), ECF No. 53; as well as the affidavits, deposition testimony, and other exhibits attached to the motion papers. Citations to a party's Local Rule 56.1 statement incorporate

commercial and manufacturing buildings used as residences, despite lacking residential certificates of occupancy. Def.'s SOF ¶ 5; Pl.'s SOF ¶ 5. In New York City, buildings that fit this description and were also occupied as a residence by three or more families living independently of one another became known as interim multiple dwellings ("IMD"). Def.'s SOF ¶ 4; Pl.'s SOF ¶ 4; Expert Rep. Lanny R. Alexander ("Alexander Rep.") at 4, Wozman Decl., Ex. H, ECF No. 48-8. Pursuant to the Loft Law, after an IMD is legalized—meaning it has come into compliance with state and city housing laws designed to protect the public health, safety, and general welfare, MDL § 280—the Loft Board sets the legal regulated base rent for the IMD units, orders the owner to register the units with the New York State Division of Housing and Community Renewal ("DHCR"), and the building is then removed from Loft Law jurisdiction. Def.'s SOF ¶ 6; Pl.'s SOF ¶ 6.

The Loft Law also provides mechanisms for deregulating IMD units from rent regulation. Def.'s SOF ¶ 7; Pl.'s SOF ¶ 7. Under MDL § 286(12), one pathway to deregulation is known as a "Sale of Rights," which allows an owner and a residential occupant to negotiate a price by which the owner can buy the resident's rights to the unit. Def.'s SOF ¶¶ 8-9; Pl.'s SOF ¶¶ 8-9. After the owner purchases the rights, the unit can continue to be used for residential purposes, or it can be returned to commercial use, which relieves the owner of all Loft Law obligations. Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8. In situations where a Sale of Rights is obtained but the unit remains in residential use, the unit is still subject to Loft Law legalization requirements, but "the unit is no longer subject

---

by reference the documents cited therein. The facts recounted below are undisputed except where otherwise noted. Where a party purports to dispute the opposing party's statement of material fact but does not cite to admissible evidence controverting the statement, the Court will treat the statement as undisputed. *See* Loc. Civ. R. 56.1(d).

to rent regulation where coverage under [the Loft Law] was the sole basis for such rent regulation." Def.'s SOF ¶ 8; Pl.'s SOF ¶ 8.

Another pathway to deregulation is MDL § 286(6), which is commonly referred to as a "Sale of Improvements" or a "Sale of Fixtures." Def.'s SOF ¶¶ 10-11; Pl.'s SOF ¶¶ 10-11. Under MDL § 286(6), a tenant may sell—to either an incoming tenant or to the owner—any improvements they have purchased or made to the unit, provided they first offer to sell the improvements to the owner "for an amount equal to their fair market value." Def.'s SOF ¶ 10; Pl.'s SOF ¶ 10. In relevant part, if an owner purchases those improvements, "any unit subject to rent regulation solely by reason of this article . . . shall be exempted from the provisions of this article requiring rent regulation . . . ." Def.'s SOF ¶ 10; Pl.'s SOF ¶ 10.

MDL § 286(6) and MDL § 286(12) are often exercised in tandem, however, a Sale of Rights, MDL § 286(12), can only be made *prior* to a building leaving Loft Board jurisdiction, while a Sale of Improvements, MDL § 286(6), can occur after a building is no longer subject to Loft Board jurisdiction. Def.'s SOF ¶ 13; Pl.'s SOF ¶ 13. To determine whether there has been a valid Sale of Rights or Sale of Improvements while a building is in Loft Law jurisdiction, the Loft Board holds a hearing on application by a party with standing, generally a subsequent tenant with occupancy. Def.'s SOF ¶ 14; Pl.'s SOF ¶ 14. Both MDL § 286(6) and § 286(12) are commonly referred to as "Buyout Agreements" or "Sales Agreements." Def.'s SOF ¶ 12; Pl.'s SOF ¶ 12.

## II.     302 Canal Street

At all relevant times up to November 9, 2020, Charbern owned real property located at 302 Canal Street, New York, New York ("the Property"). Def.'s SOF ¶ 3; Pl.'s SOF ¶ 3. Charbern is a limited liability company with two members: the Roger Roth Living Trust and the Bernice Irrevocable Trust. Def.'s SOF ¶ 1; Pl.'s SOF ¶ 1. The sole trustee of both trusts is Roger Roth ("Roth"). Def.'s SOF ¶ 1; Pl.'s SOF ¶ 1.

3

Based on the issuance of a proper residential Certificate of Occupancy, in September 1997, Charbern Realty Co.—the then-owner of the Property—filed an application entitled Notice of Rent Guidelines Increase regarding units 3 and 4/5 of the Property.  Def.'s SOF ¶ 15; Pl.'s SOF ¶ 15. A January 1998 Report and Recommendations recommended that the Loft Board grant Charbern Realty Co.'s application and set initial legal regulated rents for units 3 and 4/5.  Def.'s SOF ¶16; Pl.'s SOF ¶ 16.  Pursuant to *Matter of Charbern Realty Co.*, Loft Board Order 2218, in March 1998, the Loft Board set the legal regulated base rents for units 3 and 4/5 and instructed Charbern Realty Co. to register the units with DHCR.  Def.'s SOF ¶ 17; Pl.'s SOF ¶ 17.  At this point, the units transitioned into rent stabilization.  Pl.'s SOF ¶ 127.  Defendant alleges that the Order also removed the Property from the Loft Board's jurisdiction such that the Property ceased being subject to the Loft Law, Def.'s SOF ¶ 17; Plaintiff, however, alleges that the Order did not specify whether the Property was no longer subject to the Loft Law.  Pl.'s SOF ¶ 17(a).

Thus, in or about May 2019, the Property contained two IMD rent-regulated units—unit 3 and unit 4/5.  Def.'s SOF ¶ 19; Pl.'s SOF ¶ 19.  In addition to these units, the first floor of the Property had a commercial tenant, General Nutrition Center ("GNC"), which was paying a monthly rent of $18,510.00.  Def.'s SOF ¶¶ 19-20; Pl.'s SOF ¶¶ 19-20.

### III.    Borah's Representation

Around May 2019, Charbern retained Borah, a law firm incorporated in New York, Def.'s SOF ¶ 2; Pl.'s SOF ¶ 2, in an effort to sell the Property.  Def.'s SOF ¶ 18, Pl.'s SOF ¶ 18.  As early as July 2019, Borah prepared Sales Agreements for Charbern in an effort to effectuate a Sale of Rights pursuant to MDL § 286(12) for unit 3 and unit 4/5.  Def.'s SOF ¶ 35; Pl.'s SOF ¶ 35.  At some point in September, prior to September 27, 2019, Borah submitted these Sales Agreements to the Loft Board.  Def.'s SOF ¶ 36; Pl.'s SOF ¶ 36.

Meanwhile, Charbern, through Roth, proceeded to negotiate with potential purchasers. Def.'s SOF ¶¶ 21-23; Pl.'s SOF ¶¶ 21-23.  First, Charbern negotiated a potential sale of the Property with Benchmark Real Estate Group, L.P. ("Benchmark") for $5,325,000.  Pl.'s SOF ¶ 132.  Benchmark agreed to accept the Buyout Agreements prepared by Borah; Benchmark just wanted a copy of those Agreements.  Pl.'s SOF ¶ 134.  Then, on September 23, 2019, Roth emailed Borah to say that he had settled on a different purchaser—BMSK—and that he was going to accept their offer to purchase the Property for $5,350,000.  Def.'s SOF ¶¶ 21-23, 120; Pl.'s SOF ¶¶ 21-23, 120.  Roth also informed Borah that he had provided BMSK's counsel with a contract that Borah had prepared months before, and that BMSK had returned a marked-up version, which he attached to the email.  Def.'s SOF ¶ 24; Pl.'s SOF ¶ 24.

The marked-up contract contained a new provision: the first version of Section 10.17, which outlined the Seller's Obligations.  Def.'s SOF ¶ 25; Pl.'s SOF ¶ 25.  According to the final version of Section 10.17, at closing:

> Seller shall provide to Buyer the original written sales records and sales agreements relating to the prior occupancies in the 3rd, 4th and 5th floor units which are in compliance with Multiple Dwelling Law Section 286(12). If the original has been filed, Seller shall deliver to Purchaser the original proof of filing with the Loft Board.

Def.'s SOF ¶ 28; Pl.'s SOF ¶ 28.  And Section 10.17(a) of the final contract states:

> As a condition of Closing, Seller shall use good faith efforts to deliver at Closing the original signed, notarized modified Surrender and Sales Acknowledgement Agreement (the "Modified Agreement") in the form attached hereto as Exhibit "E" from Rachel Mullin the prior tenant of the 3rd floor and Seller shall deliver, as a condition of Closing, the original notarized Modified Agreement from the current tenants of the 4th and 5th floor units.  Seller shall not file the Modified Agreement with the Loft Board prior to Closing.

Pl.'s SOF ¶ 29(a).[2] The contract also contained a provision, Section 5.03, which provides that GNC's occupancy of the first floor of the Property "will be in effect as of the Closing Date." Def.'s SOF ¶ 33; Pl.'s SOF ¶ 33.

On September 27, 2019, Borah returned the final contract to Roth and instructed him to sign it and send it back as soon as possible. Def.'s SOF ¶ 27; Pl.'s SOF ¶ 27. Roth signed the contract, and it became effective September 27, 2019. Def.'s SOF ¶ 31; Pl.'s SOF ¶ 31.

On October 25, 2019, Borah received letters from the Loft Board questioning whether the Sale of Rights Agreements submitted by Borah pursuant to MDL § 286(12) were the correct mechanism for deregulating unit 3 and unit 4/5. Def.'s SOF ¶ 38; Pl.'s SOF ¶ 38. The Loft Board indicated that Sale of Improvement Agreements pursuant to MDL § 286(6) would be the proper mechanism to deregulate the units. Def.'s SOF ¶ 38; Pl.'s SOF ¶ 38. On November 27, 2019, Borah responded to the Loft Board, stating its understanding that a Sale of Rights pursuant to MDL § 286(12) included a Sale of Improvements, and was the proper mechanism to deregulate the units. Def.'s SOF ¶ 39; Pl.'s SOF ¶ 39. Nevertheless, Borah indicated it would correct the filings with the Loft Board. Def.'s SOF ¶ 39; Pl.'s SOF ¶ 39. Borah proceeded to revise those filings, in part

---

[2] Plaintiff and Defendant appear to disagree about the language of Section 10.17(a). Defendant states that the final language of Section 10.17(a) reads:

> In addition [to] the foregoing, as a condition of Closing, Seller shall deliver at Closing the original signed and notarized modified Surrender and Sales Acknowledgement Agreements (the "Modified Agreements") from the prior tenants of the 3rd, 4th and 5th floor units in the form attached hereto as Exhibit "E." Seller shall not file the Modified Agreement with Loft Board.

Def.'s SOF ¶ 29. For purposes of this motion, the Court adopts Plaintiff's construction of Section 10.17(a), as it reflects the language included in Wozman Decl., Ex. I, ECF No. 48-9, which Wozman represents to be the actual signed Purchase and Sale Agreement.

to include Sales of Improvements pursuant to MDL § 286(6), twice: once in February 2020 and again in April 2020. Def.'s SOF ¶¶ 40-42; Pl.'s SOF ¶¶ 40-42.

Pursuant to Section 8 of the contract, closing on the Property was to occur on or before March 27, 2020. Def.'s SOF ¶¶ 30-31; Pl.'s SOF ¶¶ 30-31. In late March 2020, Borah contacted BMSK to schedule the closing for March 31, 2020. Def.'s SOF ¶ 43; Pl.'s SOF ¶ 43. BMSK, however, responded that a new closing date should be set for after the COVID-19 emergency ended, and for when Charbern would be able to provide various deliverables, including those of Section 10.17, as required by the contract. Def.'s SOF ¶¶ 43-45; Pl.'s SOF ¶¶ 43-45. BMSK specifically stated that the contract required original written and notarized sales records and sales agreements for the prior occupants of unit 3 and unit 4/5, pursuant to MDL §§ 286(6) and (12). Def.'s SOF ¶ 45; Pl.'s SOF ¶ 45. BMSK made clear that it had not yet been provided with those documents and did not believe they had been obtained by Charbern. Def.'s SOF ¶ 45; Pl.'s SOF ¶ 45. Borah responded to BMSK's communication and included copies of two Sale of Rights and Sale Agreements for units 3 and 4/5. Def.'s SOF ¶ 46; Pl.'s SOF ¶ 46. BMSK reiterated its prior position that it was unable to set a closing date until Charbern would be able to prove and provide the deliverables pursuant to the contract. Def.'s SOF ¶ 48; Pl.'s SOF ¶ 48.

The dispute over Charbern's ability to comply with the contract's terms continued over the course of months. On April 20, 2020, Borah sent BMSK's counsel a letter advising that Charbern had completed all obligations under the contract and that it was ready, willing, and able to close title per the terms of the contract; Borah included partially completed Sale of Rights and Sale of Improvement Agreements for unit 4/5 that were notarized and signed. Def.'s SOF ¶¶ 51-52; Pl.'s SOF ¶¶ 51-52, 146. On April 28, 2020, BMSK replied, highlighting the reasons why it believed Charbern had not complied with Section 10.17 of the contract. Def.'s SOF ¶ 53; Pl.'s SOF ¶ 53. Specifically, BMSK noted that the Sale Agreements for units 3 and 4/5 provided by Borah were

7

incomplete and, in some cases, contradictory. Def.'s SOF ¶ 53; Pl.'s SOF ¶ 53. BMSK noted that

Charbern had overcharged the tenants of unit 4/5 for over a decade and that the Agreement for unit

4/5 was not valid because the Sale of Rights for $3,000 was well below the actual overcharge.

Pl.'s SOF ¶¶ 128-129, 148. Borah countered that the sale documents were in compliance with

MDL §§ 286(6) and (12), as well as with the Loft Board's rules. Def.'s SOF ¶ 55; Pl.'s SOF ¶ 55.

Meanwhile, Charbern began experiencing problems with the Property's commercial

tenant, GNC. In early April 2020, Charbern informed Borah that GNC had failed to pay its rent

for the first time since assuming tenancy and that BMSK had expressed concern. Def.'s SOF ¶¶

49-50; Pl.'s SOF ¶¶ 49-50. In early May 2020, BMSK began indicating it would close title despite

its concerns over GNC and the purported issues with the Sale of Rights and Sale of Improvement

Agreements so long as the parties could negotiate a price reduction. Def.'s SOF ¶¶ 56-57; Pl.'s

SOF ¶¶ 56-57. Around this same time, BMSK conceded that the documentation related to unit 3

was sufficient to fulfil Charbern's obligations pursuant to the contract, but continued to maintain

that the Agreements for unit 4/5 were not in compliance with MDL § 286(12) for various reasons,

including inadequate consideration. Def.'s SOF ¶¶ 58-62; Pl.'s SOF ¶¶ 58-62, 151. Specifically,

BMSK noted that,

> [T]o establish that a valid sale occurred under the Loft Law in
> compliance with MDL 286(6) and (12) the owner must demonstrate
> that there was a knowing and intelligent waiver of Loft Law rights
> by the tenant in occupancy in exchange for compensation by the
> owner. . . . Since 2017 the Loft Board has taken to invalidate buyouts
> based upon its own assessment of adequate consideration.

Pl.'s SOF ¶ 150. Defendant contends that the Agreements for unit 3 and unit 4/5 were identical in

form, except for the amount of consideration; Plaintiff notes that the Agreement for unit 3 included

a list of the improvements being sold, whereas the Agreement for unit 4/5 did not. Def.'s SOF ¶

61; Pl.'s SOF ¶ 61(a).

8

Borah informed Roth that BMSK was insisting on a price reduction, and Roth grew frustrated with the delays in closing. Def.'s SOF ¶¶ 64-67; Pl.'s SOF ¶¶ 64-67. In early June 2020, BMSK advised Borah that BMSK had learned Roth was shopping the Property around to other potential buyers, despite being in contract with BMSK. Def.'s SOF ¶ 68; Pl.'s SOF ¶ 68. Roth had sent out at least one contract to another potential buyer at the reduced price of $4,730,000. Def.'s SOF ¶ 68; Pl.'s SOF ¶ 68. Borah informed Roth that, because he had sent around a contract at that reduced price, BMSK was asking to begin renegotiating around $4,730,000. Def.'s SOF ¶¶ 69-71; Pl.'s SOF ¶¶ 69-71. Roth responded that this was "just about a price that it's not worth it to sell." Def.'s SOF ¶ 73; Pl.'s SOF ¶ 73.

IV.    **Nesenhoff's Representation and Sale of the Property**

In mid-June, believing that Borah was holding back correspondence with BMSK, Roth informed BMSK that he wanted "a different law firm to take charge from here" and that "Ira Nesenhoff will contact you to take the reigns from here." Def.'s SOF ¶¶ 74-75; Pl.'s SOF ¶¶ 74-75. Prior to retaining Nesenhoff, however, on June 25, 2020 Roth told Borah that he was unable to provide a lower price to negotiate from because GNC had declared bankruptcy, and it wasn't clear whether it would remain a tenant of the Property. Def.'s SOF ¶ 76; Pl.'s SOF ¶ 76. Then, the next day, GNC surrendered its interest in the Property. Def.'s SOF ¶ 77; Pl.'s SOF ¶ 77. On June 29, 2020, Charbern retained the firm Nesenhoff & Miltenberg ("Nesenhoff") to represent it in the sale of the Property. Def.'s SOF ¶ 78; Pl.'s SOF ¶ 78.

Accordingly, on July 3, 2020, BMSK corresponded with Nesenhoff, again stating it desired to negotiate a price reduction because the market value of the building had decreased due to GNC's vacancy, the pandemic, and "all the problems with the deregulation of the residential floors." Def.'s SOF ¶ 80; Pl.'s SOF ¶ 80. Roth, however, continued to communicate with Borah. On July 5, 2020, Roth emailed Borah asking whether BMSK "ha[s] the right to decline closing this

9

transaction" due to GNC's bankruptcy and the contract provision requiring GNC's occupancy of the commercial space. Def.'s SOF ¶ 81; Pl.'s SOF ¶ 81. Borah responded that GNC's lease was one reason BMSK was interested in a price reduction. Def.'s SOF ¶ 82; Pl.'s SOF ¶ 82. On July 27, 2020, Roth again emailed Borah, this time inquiring why Borah had amended the Buyout Agreements multiple times, and informing Borah that it was the opinion of BMSK's counsel that those Agreements were insufficient. Def.'s SOF ¶ 85; Pl.'s SOF ¶ 85. Borah responded, in part, that,

> A significant reason why the closing of title has not occurred yet is due to your actions sending a separate Contract of Sale to a third party – using our form without our knowledge, at a purchase price of $4.73 million, $620,000.00 less than the purchase price in the BMSK Contract. The buyer's attorney became aware of this proposed contract almost immediately, and has been attempting to negotiate from that price, rather than from the purchase price that we negotiated on your behalf. That, plus the bankruptcy of the commercial tenant due to COVID-19, are the reasons why you have not been able to close title.

Def.'s SOF ¶ 86; Pl.'s SOF ¶ 86. Borah also informed Roth that many buyers of buildings similar to the Property were demanding price reductions in the wake of the COVID-19 outbreak. Def.'s SOF ¶ 87; Pl.'s SOF ¶ 87.

Under Nesenhoff's representation, Roth ultimately agreed to reduce the sale price of the Property to $4.3 million, and closing occurred on November 9, 2020. Def.'s SOF ¶¶ 88, 106; Pl.'s SOF ¶¶ 88, 106. Roth later testified that he "did not proceed at the closing price that was decided with Borah . . . because I felt there was no way that I could legally trust the advice that was given to my attorney . . . ." Def.'s SOF ¶ 101; Pl.'s SOF ¶ 101. The operative contract negotiated by Nesenhoff states that in consideration for the price reduction, BMSK waives all objections to the documents previously tendered in satisfaction of Section 10.17 and 10.17(a), and agrees to accept the vacant commercial unit. Def.'s SOF ¶¶ 98-99; Pl.'s SOF ¶¶ 98-99. BMSK provided Roth with

10

its own buyout documents that Roth requested all tenants sign.  Def.'s SOF ¶ 90; Pl.'s SOF ¶ 90.

It now appears that unit 4/5 has been deregulated.  Def.'s SOF ¶¶ 111-116; Pl.'s SOF ¶¶ 111-116.

**LEGAL STANDARD**[3]

Summary judgment is appropriate where there is "no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also*

*Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).  A dispute is genuine "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of demonstrating the

absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at

trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an

essential element of the nonmoving party's claim."  *Goenaga v. March of Dimes Birth Defects*

*Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex*, 477 U.S. at 322-23).

In ruling on a motion for summary judgment, the court must view all evidence "in the light

most favorable to the non-moving party," *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373

F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual

inferences in favor of the party against whom summary judgment is sought."  *Johnson*, 680 F.3d

at 236.  But the non-moving party must advance more than a "scintilla of evidence," *Anderson*,

477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts,"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving

party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory

---

[3] All references to Rules are to the Federal Rules of Civil Procedure.  In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

11

statements." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996). "Affidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

The crux of Charbern's claim against Borah is that Borah failed to advise Charbern—before Charbern signed the contract with BMSK—that Charbern did not possess the documentation that could satisfy the requirements of Section 10.17 of the contract, the purpose of which was to establish to BMSK's satisfaction that the residential units in the building could be deregulated. Pl.'s Mem. Law Opp'n Mot. Summ. J. ("Pl.'s Opp'n") at 23, ECF No. 49. Charbern asserts that, because of this, it was ultimately forced to negotiate a price reduction with BMSK. *Id.* at 26. Further, Charbern argues that if Charbern had been cognizant of the deficiencies with the documentation ultimately required by the contract, Charbern would have accepted a different offer from Benchmark, which did not require such documentation. *Id.*

Borah moves for summary judgment on the basis that Charbern cannot establish two necessary elements of legal malpractice: negligence and proximate cause. Def.'s Mem. Law Supp. Mot. Summ. J. ("Def.'s Supp.") at 2, ECF No. 45. Borah also moves for summary judgment on its counterclaim for breach of contract because, as Borah alleges, there was a material breach when Charbern refused to pay for legal services provided by Borah. *Id.* at 2-3. As discussed herein, Borah is not entitled to judgment as a matter of law and the motion for summary judgment is **DENIED**.

## I.    Legal Malpractice

The parties do no dispute that New York law applies to Charbern's legal malpractice claim. *See, e.g.*, *Nordwind v. Rowland*, 584 F.3d 420, 429 (2d Cir. 2009). "To prevail on a claim for legal malpractice under New York law, a plaintiff must establish: (1) attorney negligence; (2) which is the proximate cause of a loss; and (3) actual damages." *Id.* "For a defendant in a legal malpractice case to succeed on a motion for summary judgment, evidence must be presented in admissible form establishing that the plaintiff is unable to prove at least one of the essential elements." *Rubens v. Mason*, 387 F.3d 183, 189 (2d Cir. 2004).

As explained below, the Court concludes that Borah was negligent with respect to its representation of Charbern, however there are genuine disputes of fact with respect to whether Borah's negligence was the proximate cause of Charbern's loss.

### A.    Negligence

To establish attorney negligence, a plaintiff must show that the attorney's conduct "fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of [the] profession." *Achtman v. Kirby, McInerney & Squire, LLP*, 464 F.3d 328, 337 (2d Cir. 2006). Plaintiffs generally proffer expert opinion evidence to establish negligence, although "the requirement . . . may be dispensed with where ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service." *Est. of Nevelson v. Carro, Spanbock, Kaster & Cuiffo*, 686 N.Y.S.2d 404, 405-06 (N.Y. App. Div. 1999); *see also Boye v. Rubin & Bailin, LLP*, 56 N.Y.S.3d 57, 63 (N.Y. App. Div. 2017).

Borah's representation fell below the ordinary and reasonable standard of care required by the profession. The contract between Charbern and BMSK required Charbern to provide sales agreements with respect to unit 3 and unit 4/5 that were *in compliance with* MDL §§ 286(12) and 286(6). As both Borah's and Charbern's experts agree, the purpose of Sections 10.17 and 10.17(a)

13

of the contract was to provide BMSK with the paperwork necessary to deregulate the units. Alexander Rep. at 26 (noting that even if there was no valid 286(12) sale, "the Sale of Improvements pursuant to 286(6) . . . served to deregulate these units"); Expert Rep. Fred L. Seeman ("Seeman Rep.") at 6-7, Soloveichik Decl., Ex. A, ECF No. 50-1 ("[Borah] ought to have known . . . that the de-regulation event as represent in the contract, was a sale of 'Loft Law' rights and improvements, subject to . . . 286-(6) and 286-(12)").  Likewise, both experts agree that under the MDL, such Sales Agreements must be "knowing and intentional" in order to form the basis for deregulation.  Alexander Rep. at 21 ("[T]o be valid, an agreement should contain language demonstrating that there was a knowing and intelligent waiver of the Loft Law rights by the tenant in exchange for compensation by the owner . . . ."); Seeman Rep. at 11 ("The Loft Board has consistently invalidated sales of Loft Law and improvements, under 286-(6) and 286-(12), where an owner cannot demonstrate that these sales were in fact a 'knowing and intentional waiver of rights[.]'").

One critical indicia of a "knowing and intentional" Sale of Rights or Improvements is whether there is adequate consideration.  BMSK's counsel explicitly raised this issue with Borah during their discussions, pointing out that "[s]ince 2017 the Loft Board has taken to invalidate buyouts based upon its own assessment of adequate consideration."  Pl.'s SOF ¶ 150.  They were right to be concerned.  Here, the tenants of unit 4/5 were offered only $3,000 in total (or $1,000 each) in exchange for the sale of their rights and improvements of a duplex loft in the heart of TriBeCa.  *See* Copy of 286(12) Sales Agreements, Nerenberg Aff., Ex. M, ECF No. 46-14; Revised Sales Agreements, Nerenberg Aff., Ex. P, ECF No. 46-17.  Borah's expert opines, without citing to any authority, that "[t]he Loft Board has never specified what they consider[] to be adequate consideration . . . except to opine that $10.00 was too low and that the return of a security deposit was not acceptable . . . ."  Alexander Rep. at 21.  But the Loft Board has found that a buyout price

14

of $2,500 was "well below market value" and thus indicated there was no knowing waiver of rights. *Matter of Brandman*, Loft Board Order No. 4944, at 6. And in another case, the Loft Board found that consideration of less that $3,500 was, in their experience, "an unusually low figure for a buyout . . . ." *Matter of 99 Sutton LLC*, Loft Board Order No. 4656, at 4. [4]

A sum of $3,000 becomes particularly concerning when compared to the consideration offered to the tenants of unit 3, which is notably *not* a duplex loft. In 2016, a former unit 3 tenant was offered $200,000 pursuant to MDL §§ 286(6) and 286(12); and in 2019—the same year the tenants of unit 4/5 were offered only $3,000—the unit 3 tenant was offered $10,000 pursuant to MDL §§ 286(6) and 286(12). Nerenberg Aff., Ex. P, at 4-5. In light of that history and the prior Loft Board decisions described above, a buyout agreement for $3,000 for unit 4/5 was insufficient to show a knowing and intentional sale of rights, and the agreements prepared by Borah were therefore inadequate to meet the contractual requirements with BMSK because the agreements were not in compliance with the relevant MDL laws; as such, Borah fell below the ordinary and reasonable standard of care required by the profession. [5]

**B.    Proximate Cause**

To establish proximate cause, a lawyer must proximately have caused the client's claimed harm to be liable in malpractice. *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 118 (2d Cir. 2005).

---

[4] Borah's expert tries to distinguish *Matter of 99 Sutton LLC*, saying it involved a return of a security deposit, which is not in dispute in this matter. Alexander Rep. at 22. The Court notes, however, that in that case, the Loft Board rejected an agreement of less than $3,500 in consideration precisely because it was so low that it likely indicated a security deposit refund instead of an additional payment. *Matter of 99 Sutton LLC*, at 4. Should the buyout agreement in this matter ever come before the Loft Board, the Court can find no reason to believe the Loft Board would not reach a similar conclusion.

[5] Much is made of the fact that these were closing obligations, and that Borah had until the time of closing to deliver. *See e.g.*, Def. Supp. at 1. But BMSK raised the issue of consideration with Borah, and Borah made no efforts to cure.

"[A] plaintiff must show that he or she would have prevailed in the underlying action or would not have incurred any damages, but for the lawyer's negligence." *Rudolf v. Shayne, Dachs, Stanisci, Corker & Sauer*, 867 N.E.2d 385, 387 (N.Y. 2007). An intervening act will not be considered a superseding cause that relieves a defendant of liability for its negligence when "the intervening act is a natural and foreseeable consequence of a circumstance created by defendant[.]" *Kush v. City of Buffalo*, 449 N.E.2d 725, (N.Y. 1983). Speculation and conclusory pleading of "but for" causation cannot support a claim of legal malpractice. *See Schutz v. Kagan Lubic Lepper Finkelstein & Gold LLP*, 552 F. App'x 79, 80 (2d Cir. 2014); *see also Schweizer v. Mulvehill*, 93 F. Supp. 2d 376, 395 (S.D.N.Y. 2000) ("Mere speculation of a loss resulting from an attorney's alleged omissions is insufficient to sustain a prima facie case in malpractice."). Moreover, an attorney cannot be the proximate cause of any damages sustained by its former client when the damages were caused by the "intervening and superseding failure" of successor counsel to protect the client's interests or by the acts of the client. *See Schutz*, 552 F. App'x at 80.

Borah argues that Charbern cannot show that Borah's actions resulted in Charbern's inability to sell the Property to BMSK or another buyer. Def.'s Supp. at 27. Borah points to the pandemic, GNC's vacancy, Roth's negotiations with other buyers while in contract with BMSK as evidence of intervening causes, and it also points to Roth's decision to ignore BMSK's legal advice that the Buyout Agreements satisfied Section 10.17 of the contract. *Id.* Charbern counters that but-for Borah's negligence in failing to advise Charbern that meeting the obligations of Section 10.17 would be challenging, BMSK would have been contractually obligated to purchase the Property at the negotiated price of $5,350,000. Pl.'s Opp'n at 26. Charbern argues that Borah's contention that intervening factors, not Borah's alleged negligence, resulted in the reduced sales price is speculative because BMSK would have been eager to keep its deposit. *Id.* Charbern further argues that two of the intervening factors Borah relies on—GNC's vacating of the property

16

and Roth's discounted offer—occurred after the contract's scheduled closing date. *Id.* at 27. Finally, Charbern argues that it was foreseeable that Charbern would be forced to renegotiate a lower price as a result of Borah's alleged negligence, because Charbern was unable to perform under the contract. *Id.*

Borah's arguments are unavailing on summary judgment. Charbern does more than make speculative arguments that the facts here may establish proximate cause. Charbern had an offer from Benchmark on hand for a similar price that did not require the Buyout Agreements that the offer from BMSK did. Had Borah advised Charbern that meeting the Section 10.17 requirements might present a challenge, Charbern could have either (1) attempted to negotiate those requirements out of the contract, which—with a counteroffer from Benchmark on the table—may have been entirely plausible, or (2) declined BMSK's offer and opted to sell to Benchmark instead.

But that is not to say that proximate cause has been established. Borah presents facts that may establish it was Charbern's own intervening actions—such as the initial decision to decline Benchmark's offer in favor of BMSK, and sending a contract to another potential buyer for a much lower price while in contract with BMSK—and not any negligence on the part of Borah, that led to the ultimate sale of the property at a reduced price. There are also many other factors described above, including the pandemic and the loss of GNC as a tenant, that may have caused the sale of the property at a reduced price. These are questions of fact that are appropriate for resolution on summary judgment, and Borah's motion is **DENIED**.

## II. Breach of Contract

The Court also concludes that summary judgment is inappropriate on Borah's breach of contract counterclaim. A breach of contract claim requires the plaintiff to prove (1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach. *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d

17

Cir. 2015). "Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007). A plaintiff seeking to recover damages for breach of contract must be "free from fault in respect to performance." *Gen. Ins. Co. of Am. v. K. Capolino Constr. Corp.*, 983 F. Supp. 403, 424 (S.D.N.Y. 1997).

Borah's counterclaim against Charbern rests on Borah's performance under the contract. Def.'s Supp. at 30. Because there is a material issue of fact as to whether Borah is at fault with respect to the legal counsel it provided to Charbern, there is also a material issue of fact as to whether Charbern was excused from performance. Borah's motion for summary judgment is **DENIED**.

## CONCLUSION

For the reasons given above, Defendant's motion is **DENIED**. By March 16, 2026, the parties are directed to submit a joint letter stating the estimated length of trial and the parties' availability for a trial between June 22 and August 30, 2026, and during the month of October 2026. The parties shall further indicate whether they request a referral to the District's mediation program or to the assigned Magistrate Judge for a settlement conference.

The Clerk of Court is respectfully requested to terminate ECF No. 42.

SO ORDERED.

Dated: February 27, 2026

New York, New York

_____

DALE E. HO
United States District Judge

18